Filed 3/17/14  P. v. Contreras CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056798 |
| v. | (Super.Ct.No. FSB900414) |
| MARCUS ANTHONY CONTRERAS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Michael A. Smith, Judge.  (Retired Judge of the San Bernardino Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed with directions.

Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Andrew Mestman and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Marcus Anthony Contreras appeals after he was convicted by a jury of first degree murder (Pen. Code, § 187, subd. (a)) and felony evading an officer (Veh. Code, § 2800.2, subd. (a)). Defendant was sentenced as a second striker to an aggregate prison term of 50 years to life, plus six years, consisting of 25 years to life, doubled, on the murder count (count 1), plus a consecutive five-year enhancement for a prior serious or violent felony conviction, plus a consecutive one-year weapon use enhancement. The court also imposed a concurrent term of two years on count 2, the evading-an-officer violation.

On appeal, defendant now contends that the trial court should have stayed the sentence on count 2. He also argues that the trial court incorrectly calculated his presentence custody credits.

The People concede that defendant is entitled to one additional day of actual custody credit. Otherwise, however, the judgment is affirmed.

FACTS AND PROCEDURAL HISTORY

Defendant had known the victim, Jeremy Ivens, since they were both teenagers. They had purchased some heroin together and, according to defendant, Ivens still owed him $400 on that transaction. On January 26, 2009, defendant went to Ivens's apartment, because Ivens had promised to pay the money he owed. Defendant was also to bring another ounce of heroin, which he would front to Ivens. While defendant went into the apartment, defendant's friend "Peewee" waited in the car outside. Peewee retained the

2

ounce of heroin. Shortly after defendant arrived, Ivens asked if defendant had brought the heroin with him. Defendant said that he had.

According to defendant's testimony, Ivens then attacked, stabbing defendant in the head from behind. Defendant managed to wrest the knife from Ivens, and proceeded to stab Ivens several times. Defendant also grabbed a dumbbell and struck Ivens. Defendant left the apartment. He was not sure whether Ivens was alive or dead. He took property from Ivens's apartment, including a laptop computer and a money order, which he estimated to be worth the amount that Ivens owed him.

Later that evening, defendant was driving on Highland Avenue in San Bernardino. A police officer, Sharon Bonshire, who was stopped at a gas station, saw defendant drive past at a high rate of speed. Officer Bonshire began to follow defendant's vehicle. She pulled up behind defendant when he was stopped at a red light, and activated the overhead lights and siren of her patrol car to indicate to him that he should pull over.

Defendant instead sped off through the red light. Officer Bonshire pursued defendant through a residential neighborhood; defendant reached speeds of 70 miles per hour. Defendant hit a dip in the road, lost control of his vehicle, and ran into a curb. Defendant bailed out of the driver's side door and ran away; Peewee exited the passenger door and fled in the opposite direction.

Officer Bonshire began to chase defendant on foot, and saw him stumble on a short retaining wall or block wall, before she lost sight of him. Officers found defendant's baseball cap (with stains of dried blood on the outside), a tennis shoe, and a watch near the wall.

The police established a search perimeter, after which a police dog found defendant hiding behind a pile of carpets in a backyard. Defendant was wearing only one tennis shoe. Defendant was ordered to come out, but when he failed to do so after repeated commands, the officers released a police dog to subdue him. The dog bit and scratched at defendant until he was taken into custody. Defendant was treated at the hospital for some dog-inflicted injuries and carpet burns. He also had an injury resembling a knife cut on the small finger of his left hand.

In defendant's pocket, police found a money order for $40 made out to Ivens, and $200 in cash; the cash was stained with blood. Blood was also found on one of defendant's shoes, as well as his baseball cap. From defendant's car, police recovered a wallet with Ivens's driver's license and credit cards, a bloody kitchen knife, a dumbbell covered in blood, several other knives, and a laptop computer.

After finding Ivens's wallet in defendant's car, and because of concern arising from the bloodstains on several items, sheriff's deputies were dispatched to do a welfare check on Ivens. Ivens was found in his apartment, alive but unconscious, and covered in blood. Blood spatter on the wall was probably caused by arterial spurting. Ivens had over 40 sharp-force incision and laceration injuries to his head, neck and face. He also

4

had three skull fractures. One of the incision wounds cut his trachea and carotid artery. Ivens was later declared brain dead as a result of his severe injuries.

At the scene, deputies found a blood smear near the doorknob of the unlocked apartment door. Inside, they found items on the kitchen counter indicating recent heroin use (spoon, wad of cotton tissue), and they found a star nut from a dumbbell set under the dining table. A camera found in the apartment had photographs of defendant and Ivens, taken about one week before the murder.

Forensic testing showed that Ivens's blood was a "major donor" to the blood found on the knife, on the heel of defendant's shoe, on defendant's cap, and on the collar of the dumbbell. Defendant's DNA was a possible minor contributor to blood on the baseball cap and on the knife handle.

Defendant's version was that he was defending himself from Ivens. When Ivens attacked him with the knife, defendant punched at Ivens with his fists, aiming for his face and head. A blow to the head stunned Ivens, who fell and dropped the knife. Defendant grabbed the knife and jumped on Ivens; Ivens was "still putting up a fight," so defendant tried to stab the side of Ivens's neck. The struggling pair scrambled up to the dining room table. Ivens was still moving his arms and reaching for a dumbbell lying on the floor next to the table, so defendant kept stabbing until Ivens stopped struggling. Defendant got control of the dumbbell. Because Ivens was still trying to fight with him, defendant struck him with the dumbbell, to "hold him down." Defendant claimed he

5

intended only to defend himself, and did not intend to kill Ivens. He only stabbed and hit Ivens until he felt that Ivens "wasn't going to get up."

When defendant left the apartment, he was not sure whether Ivens was still alive. He took the wallet and computer as items of "equal value" to the amount Ivens owed him. Defendant took away the knife and the dumbbell for no reason. Peewee was still in the car with the ounce of heroin.

Defendant was in a confused and blank state of mind when he drove away. He had no particular destination in mind. He ended up in San Bernardino, driving on Highland Avenue. He panicked when he became aware of the police car behind him, directing him to pull over. He was afraid because Peewee was still in the car holding the ounce of heroin, and because he was on parole. He fled instead, without knowing where he was going. He admitted running several stop signs while attempting to evade the officer.

As a result of these events, defendant was charged with the first degree murder of Ivens (count 1) and felony evading an officer (count 2). As to the murder count, the information alleged that defendant had personally used a deadly weapon (a knife) in the commission of the offense (Pen. Code, § 12022, subd. (b)(1)). The information also alleged that defendant had a prior strike conviction for burglary in 1997 and another strike for assault with a deadly weapon in 2007, and alleged the same two convictions as prior serious felony enhancements.

6

A jury convicted defendant of both the murder and the evading-an-officer offenses, and found true the allegation that defendant had personally used the knife. In a bifurcated proceeding, defendant admitted the prior burglary conviction, both as a strike and as a prior serious felony enhancement. The court dismissed the remaining strike/serious felony prior.

The court denied probation and imposed a prison sentence. As to count 1, the sentence was 25 years to life, doubled to 50 years to life, plus a consecutive five-year enhancement for the burglary prior serious felony, plus a consecutive one-year term for the personal use of a weapon. As to count 2, the court imposed the middle term of two years, to be served concurrently with count 1.

Defendant filed a notice of appeal.

## ANALYSIS

### I. The Trial Court Was Not Required to Stay the Sentence on Count 2

Defendant first contends that the trial court should have stayed the sentence imposed on count 2, pursuant to Penal Code section 654. He argues that the evading-an-officer offense was part of an indivisible transaction, together with the murder, and therefore the proscription against double punishment applied.

Penal Code section 654 provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and

7

sentence under any one bars a prosecution for the same act or omission under any other." (Pen. Code, § 654, subd. (a).) The provision has been held to prohibit double punishment for a single act or an indivisible course of conduct. "The key inquiry is whether the objective and intent attending more than one crime committed during a continuous course of conduct was the same. [Citation.] '[I]f all of the offenses were merely incident to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once. [Citation.] [¶] If, on the other hand, defendant harbored "multiple criminal objectives," which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, "even though the violations shared common acts or were parts of an otherwise indivisible course of conduct."' [Citation.]" (*People v. Meeks* (2004) 123 Cal.App.4th 695, 704.)

Here, defendant's conduct was not indivisible in time or intent. There was no single, continuous transaction encompassing both the murder and the evading. Defendant stabbed and beat Ivens, leaving him without knowing whether he was alive or dead. Defendant carried away property to recompense himself for the money he felt Ivens had owed him, and he took away the weapons as well. He then left the scene, driving away with Peewee in the car. After that, defendant had no particular destination, and no particular intention or purpose for which he was driving along Highland Avenue. There was no pursuit from the scene of the murder, and some time had elapsed since defendant had left Ivens's apartment.

8

Defendant brought himself to the officer's attention because he was speeding along a city street. He testified that he panicked and did not stop when the officer tried to pull him over, in part because Peewee still had the heroin in the car, and also because he was on parole. His intent and objective was separate and independent from the single objective of getting away from the murder scene. The chase had nothing to do with the murder. The two offenses were not part of a continuous transaction, and his objective in fleeing from Officer Bonshire was distinct from any objective or intent having to do with the murder.

*People v. Guzman* (1996) 45 Cal.App.4th 1023, upon which defendant relies, is inapposite. There, the defendant and his fellow burglars beat up a victim who tried to prevent the burglars from escaping. It was during the course of the ongoing burglary that one of the burglars used force on the victim to retain possession of the motorcycle the burglar was stealing. "Such evidence supports a conclusion the burglary was still in progress when Miguel Guzman committed robbery and both offenses were committed pursuant to one objective and there was but a single continuous course of conduct." (*People v. Guzman*, *supra*, 45 Cal.App.4th 1023, 1028.) The burglars had not yet reached a place of temporary safety. (*Ibid.*)

Here, by contrast, defendant had already "won [his] way to a place of temporary safety," as he had achieved the space of both distance and time from the murder, without pursuit and without any knowledge on the part of law enforcement. (*People v. Guzman*,

9

*supra*, 45 Cal.App.4th 1023, 1028.) It was only the fortuity of his committing a traffic violation that drew the officer's attention.

"Whether the acts of which a defendant has been convicted constitute an indivisible course of conduct is a question of fact for the trial court, and the trial court's findings will not be disturbed on appeal if they are supported by substantial evidence. [Citations.]" (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1252-1253.) The evidence here was more than sufficient to support a finding of separate transactions and separate intents. The trial court properly imposed a separate sentence for defendant's conviction on count 2.

## II. Defendant Is Entitled to One Additional Day of Actual Custody Credit

Defendant next contends that he was entitled to one additional day of custody credit. He was arrested on January 27, 2009. He was sentenced on June 15, 2012. The number of days between the two dates is 1,236 days. The trial court awarded defendant 1,235 days of actual custody credit. The People concede that the calculation was incorrect. The abstract of judgment should be corrected to reflect a total of 1,236 days of presentence custody credit.

## DISPOSITION

The calculation of defendant's presentence custody credit was in error; defendant should have been awarded 1,236 days, not 1,235 days, of actual custody credit. The court is ordered to modify the abstract of judgment to reflect this correction, reflecting the corrected number of days' credit, and to forward a copy of the corrected abstract of

10

judgment to the Department of Corrections and Rehabilitation.  In all other respects, the

judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

HOLLENHORST
Acting P. J.

KING
J.

11